MINNEAPOLIS COLD STORAGE CO. *v.* UNITED STATES (No. 1988).[1]

1. IMPORTATION WITH REFERENCE TO RATE AND CLASSIFICATION.

   Although the *rate* of duty applicable to imported goods at the time they come into customs custody may or may not be the rate lawfully assessed against them (United States *v.* Cronkhite Co., 9 Ct. Cust. Appls., 129; T. D. 37980), their *classification* for duty is determined by their condition at that time.

2. CONSTRUCTION, PARAGRAPH R OF SECTION 3, TARIFF ACT OF 1913.

   The provision of paragraph R of section 3, tariff act of 1913, that the value of imported merchandise subject to an ad valorem duty shall include the value of usual and necessary coverings does not include coverings which were with the merchandise but not covering it at the time it came into customs custody.

3. COVERINGS NOT ON MERCHANDISE.

   Quarters of beef were imported, some covered with an inner covering of cotton and an outer one of burlap and others uncovered at the time the beef came into customs custody. Coverings for the uncovered beef were imported with it and were put on it at the time it was unloaded. Duty was properly levied upon the coverings which were not on the beef at the time it came into customs custody.

4. MOTION BEFORE BOARD FOR REHEARING—RIGHT TO FILE BRIEF.

   The claim in this court by importer's counsel that the Board of United States General Appraisers decided the case without waiting for his brief, because of which he made a motion for rehearing, which was denied, it not appearing that such action by the board resulted in depriving the importer of his rights, entitles the importer to no action in the premises by this court.

[1] T. D. 38200 (37 Treas. Dec., 218).

United States Court of Customs Appeals, November 25, 1919.

APPEAL from Board of United States General Appraisers, Abstract 43083.

[Affirmed.]

*Ralph B. Stevens* for appellant.
*Bert Hanson,* Assistant Attorney General, for the United States.

[Oral argument Oct. 7, 1919, by Mr. Hanson.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

BARBER, Judge, delivered the opinion of the court:

The only question in this case is whether certain cotton and burlap sacks are dutiable. They were imported into this country from Canada in refrigerated cars. These cars also contained dressed beef in quarters which was entered and passed free.

The appellant, the Minneapolis Cold Storage Co., made three entries for consumption of this dressed beef. These entries were made September 25, October 2, and October 4, 1917. In all the formal entry papers reference was made to the appropriate number of cars of fresh beef, but no mention was made of any sacks.

The duplicate consular invoice accompanying the first entry stated the number of quarters of beef to be 218 and the number of sacks, both burlap and stockinette, to be, respectively, the same as that of the quarters of beef and also contained the statement, "for storing and freezing in bond."

One consular invoice accompanying the second entry stated the number of quarters of beef in one car as 232 and the same number of stockinette sacks. Another such invoice gave the number of quarters of beef as 203 and mentioned no sacks, none evidently being in the car. The other invoice gave the number of quarters of beef as 249, of the burlap sacks 442, of the stockinette sacks 452.

As to the entry of October 4, one invoice gave the number of quarters of beef as 232 and of the stockinette sacks the same. Another gave the number of quarters of beef as 218 and that of the stockinette sacks as 452. Another invoice gave the number of quarters of beef as 234 without mentioning any sacks, while the other gave the number of quarters of beef "wrapped" as 142, "unwrapped" as 76 and the number of each kind of sacks as 76. The invoices accompanying the last two entries contained the statement, "for storing and freezing." It will be noticed that the aggregate number of quarters of beef which were unwrapped was 1,662, that of the burlap sacks 736, and that of the stockinette sacks 1,662.

It is understood that the stockinette sacks referred to in these invoices are the cotton sacks under consideration here. The collector took duty upon all the burlap and cotton sacks that did not actually inclose quarters of beef, to which action the importer duly protested, claiming that these sacks were entitled to free entry

because the beef was not dutiable and that the sacks were "the usual coverings needed and used for complete transportation of the merchandise." The claim rests upon the proposition that the usual and necessary coverings of free goods are entitled to free entry unless specifically made dutiable, which is not claimed.

No claim is made here that the rate of duty imposed upon these sacks is incorrect, assuming they are dutiable.

The testimony shows that the customs officers' seals that had been placed on the cars at the border port were intact when they arrived at the yards of the importer in Minneapolis and that the contents of the cars were, before the cars were unladen, inspected by an agent of the Department of Agriculture and by an inspector of customs, both of which inspections, it seems, were shortly before the meat was removed from the cars. At the time of such inspections all these sacks were on the floors of the cars in which they were found, with the exception of the few that were actually on some of the quarters of beef in one of the cars before referred to, but as to these last-named sacks no question arises here. In all the cars the quarters of beef were hanging on hooks. In the process of unlading the meat was taken from the hooks in the cars and placed on the hooks of an unloading platform, and concurrently therewith the sacks were placed over the bare quarters of beef.

While the evidence is not absolutely clear upon the subject, we think it supports the claim of the importer that these sacks were such as were commonly used as coverings of imported beef, when any were used. The substance of the proof, quoting a witness, was that these were "regular beef coverings," "nothing out of the usual," when beef was to be transported for export, which seems to have been the case here.

Upon this state of facts the Board of General Appraisers after a hearing overruled the protest, saying in substance that these sacks did not cover the beef when it was imported into this country and that, although they were intended to be so used, they were not in fact coverings of imported merchandise within the meaning of the statute.

In his brief in this court counsel for importer claims that these sacks, although not actually around the quarters of beef when they entered the customs jurisdiction, were nevertheless constructively around them, claiming in this connection that the importation was not accomplished until the merchandise had passed beyond the custody and control of the customs officials, which he argues continued until the beef was unladen. In making this contention he chiefly relies upon the case of United States *v.* Cronkhite Co. (9 Ct. Cust. Appls., 129; T. D. 37980). The record does not seem to show when the beef in fact passed out of the custody of the customs officials, but, assuming all that counsel claims in this respect, we are of opinion

that he misapprehends the law. The Cronkhite case as well as such others as are cited in this connection does not support his contention because they relate solely to the question as to what *rate* of duty attaches to imported goods and not as to their *classification*. The substance of the holdings on this question is well expressed in the early case of United States *v.* Benzon (24 Fed. Cas., 14577, p. 1112) at page 1117, where it was said:

> The better opinion is that the importation of foreign goods is not complete, as between the importer and the Government, so long as the goods remain in the custody of the officers of the customs, and that until they are delivered to the importer, whether on shipboard or in warehouse, they are subject to any duties on imports which Congress may see fit to impose.

Neither do we think the claim that these sacks were constructively around the beef can avail the importer in view of the recited facts. Generally speaking, merchandise is imported and liable to duty at the time when it is brought within a port of entry with intent there to unlade. United States *v.* Vowell et al. (5 Cranch, 13 U. S., 104); Meredith *v.* United States (13 Pet., 38 U. S., 486); Arnold et al. *v.* United States (9 Cranch., 13 U. S., 104); United States *v.* Cordero (1 Ct. Cust. Appls., 107; T. D. 31114).

It is also well settled that the classification of imported merchandise, and that is the issue here, must be determined in view of the condition in which it is imported. Worthington *v.* Robbins (139 U. S., 337); United States *v.* Shoverling (146 U. S., 76).

Now, these sacks when they came into the customs jurisdiction were not in fact actually covering any beef. Although designed for that purpose, they were not then so used. Indeed, two of the cars contained no sacks and in two others there were more sacks than quarters of beef, so that in order to apply all these sacks to their designed use it was necessary to take sacks imported in one car to wrap beef imported in another. We are confirmed in our opinion that coverings must be actually in use as such at the time they are brought within the customs jurisdiction, by the language of paragraph R of section 3 of the tariff act of 1913, which is invoked by the importer. That paragraph refers to various containers, including sacks; and in speaking of the value of such articles, which it states shall be included in determining the price of the merchandise, mentions:

> Other containers or coverings, whether holding liquids or solids, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, and if there be used for covering or holding imported merchandise, whether dutiable or free, any unusual article or form designed for use otherwise than in the bona fide transportation of such merchandise to the United States, additional duty shall be levied and collected upon such material or article.

In so far as a congressional understanding is indicated as to sacks and other containers, we think the fair import of the quoted language

is that a container or covering of imported merchandise must be in fact in use as such at the time it comes into customs custody. The condition of the sacks at that time must determine their *classification*, although the *rate* of duty applicable thereto may or may not be the rate then in force, depending upon the applicable provisions of the statute at the time they are released from such custody.

So far as it is necessary to note the claim of the importer's counsel that the board decided this case without waiting for his brief and because of which he made a motion for rehearing which was denied, it may be said that we are unable to find anything in the record that shows such action on the part of the board in this regard as resulted in depriving the importer of its rights.

The judgment of the Board of General Appraisers is *affirmed*.